IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08-CV-424

| | | |
|---|---|---|
| SYNERGY INVESTMENT GROUP, LLC, | ) ) ) | |
| Petitioner, | ) ) | SYNERGY INVESTMENT GROUP, LLC'S BRIEF IN SUPPORT OF ITS |
| v. | ) ) | MOTION TO STAY ARBITRATION AND/OR MOTION TO COMPEL ARBITRATION |
| PAUL DAVID ISENBERG, | ) ) | IN CHARLOTTE, NORTH CAROLINA |
| Respondent. | ) | |

## STATEMENT OF THE CASE

This action is being brought by Petitioner Synergy Investment Group, LLC ("Petitioner" or "Synergy") against Respondent P. David Isenberg ("Respondent" or "Isenberg") to stay the arbitration styled *P. David Isenberg v. Synergy Investment Group, LLC*, FINRA-DR Arb. No. 08-00688, which is currently pending before the Financial Industry Regulatory Authority, Dispute Resolution ("FINRA"), in Orlando, Florida (the "Florida Arbitration"), and/or to compel arbitration in Charlotte, North Carolina.

## STATEMENT OF FACTS

### *Parties, Jurisdiction and Venue*

Petitioner Synergy Investment Group, LLC is a Limited Liability Company organized under the laws of the State of North Carolina. Respondent P. David Isenberg is domiciled in the State of Florida. Isenberg's complaint in the underlying Florida Arbitration seeks damages between $500,000 and $1,000,000. The employment contract at issue sets Charlotte, North Carolina as the hearing location for any dispute arising under the contract.

Accordingly, this matter is properly before the Court pursuant to 28 U.S.C. §1332 and Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

### *The Required FINRA Disclosures For Isenberg's Termination*

Synergy is a broker-dealer registered with the U.S. Securities and Exchange Commission pursuant to Section 15 of the Securities Exchange Act of 1934, and a member of the Financial Industry Regulatory Authority ("FINRA"). As a FINRA member, Synergy was required to give notice to FINRA on Form U-5, Uniform Termination Notice for Securities Industry Registration, when it terminated Isenberg. *See*, FINRA By-Laws, Article V, Section 3(a)("*Following the termination of the association with a member of a person who is registered with it, such member shall, not later than 30 days after such termination, give notice of the termination of such association to the Corporation via electronic process or such other process as the Corporation may prescribe on a form designated by the Corporation…*").

Accordingly, on May 22, 2007, Synergy made its disclosure about why Isenberg was terminated to FINRA on the Form U-5 ("Termination Disclosures"). The Form U-5 is attached hereto as Exhibit A. It included the following Termination Disclosures for Isenberg:

(a) <u>On the "Investigation" Disclosure Reporting Page</u>: that Synergy received a notice of investigation from the State of Florida related to Isenberg's "*association with an individual that had been barred by the insurance industry*" and "*seminar presentation issues*;"

(b) <u>On the "Internal Review" Disclosure Reporting Page</u>: that Synergy was conducting an internal review regarding "*allegations that an individual was performing activities without being licenses [sic] under the*

*supervision of Mr. Isenberg*" and "*unaproved [sic] advertising and seminar materials and speakers*;"

  (c)  <u>On the "Termination" Disclosure Reporting Page</u>: Isenberg's "*failure to carry out supervisors [sic] responsibilities.*" The disclosure went on to state that "*Mr. Isenberg was our Branch Manager and he allowed unapproved advertisements and seminars to be used.*" The disclosure also stated that Isenberg "*also associated a person in the seminars that [sic] was barred from the insurance industry which [sic] we believe performed activities that required registration.*"

  Prior to being terminated, Isenberg's employment with Synergy was governed by two employment contracts. The first contract was entered into when Synergy initially employed him as a registered representative ("Rep Agreement"). Isenberg later entered into a second employment contract with Synergy when it named him Branch Manager and assigned him supervisory responsibilities ("OSJ Agreement"). <u>See</u>, attached hereto as Exhibit B, "Office of Supervisory Jurisdiction (OSJ) Agreement," February 2, 2004. As the Termination Disclosures show, it was Isenberg's failure to properly supervise under the OSJ Agreement that led to Synergy terminating him.

  Since the Termination Disclosures related solely to the job responsibilities inhering to Isenberg's role as Branch Manager, the only contract implicated in the arbitration proceedings is the OSJ Agreement. The OSJ Agreement states, in relevant part, as follows:

> *Any dispute or controversy of a securities matter arising between the parties, their control person, predecessors, subsidiaries, affiliates, successors, assigns or employees concerning this Agreement, its interpretation or its termination, whether arising prior to, on or subsequent date thereof, shall be resolved by arbitration. Any arbitration under this Agreement shall be conducted in*

> *Charlotte, North Carolina pursuant to the rules of [FINRA] and before an arbitration panel appointed by [FINRA].  [emphasis added]*

See, OSJ Agreement, p. 10, para. 26, Exhibit B.  Inexplicably, on March 6, 2008, Isenberg filed his complaint with FINRA in Florida, citing "*breach of contract, defamation, and tortious interference with prospective and existing business and contractual relationships.*"

On May 2, 2008, in accordance with the terms of the OSJ Agreement, Synergy filed with FINRA its motion to transfer the Florida Arbitration to Charlotte, North Carolina.  See, OSJ Agreement, p. 10, para. 26, Exhibit B.  On May 12, 2008, in his Response to Synergy's Motion to Transfer Venue, for the first time, Isenberg made it clear that his was a defamation claim when he stated:

> ***Admittedly, the Statement of Claim in this matter does reference breach of contract as one of the three claims.***  However, [Isenberg's] ***contract claim does not reference either of the contracts*** now presented by [Synergy].  In fact, ***neither of the contracts attached to [Synergy's] "Motion" is mentioned anywhere*** in [Isenberg's] Statement of Claim.  But notwithstanding the inclusion of a breach of contract claim in the Statement of Claim, ***the fact remains that the defamation tort is the Claim's focus.***
> …
> ***…this case involves a tort claim, which thus renders the contracts completely inapplicable…***
> [emphasis added]

See, Isenberg's Response to Synergy's Motion to Transfer Venue, May 12, 2008, pp. 3-4, attached hereto as Exhibit C.  By admitting that his Statement of Claim was, in fact, a single defamation claim, Isenberg effectively conceded to Synergy's argument that the only contract at issue is the OSJ Agreement, which specifies Charlotte, North Carolina as the proper venue for the arbitration proceedings.  Specifically, the Termination Disclosures that Isenberg alleges are defamatory relate not to his responsibilities as an ordinary employee (or registered representative), but to his obligation to supervise other employees.  See, Form U-5, Exhibit A, pp. 5-6 ("*under the supervision of Mr. Isenberg*")("*failure to carry out supervisors [sic]*

*responsibilities*")("*Mr. Isenberg was our Branch Manager and he allowed…to be used*"). Isenberg's duties as a supervisor did not arise solely from FINRA rules, but also arose from the OSJ Agreement itself. <u>See</u>, <u>e.g.</u>, OSJ Agreement, Exhibit B, p. 2, para. 3(b) ("*Contractor shall supervise…*"). The responsibilities did not arise from the Rep Agreement. Synergy first brought the venue provision to FINRA's attention in the Florida Arbitration through FINRA's Director of Dispute Resolution in Florida. The Director determined that the Florida Arbitration panel should decide the issue and therefore "administratively denied" the motion.[1]

## ARGUMENT

### I. THE TERMINATION DISCLOSURES RELATE SOLELY TO THE OSJ AGREEMENT.

Before the Florida Arbitration panel, Isenberg argued that the existence of the earlier Rep Agreement specifying Atlanta, Georgia as the venue somehow permitted the Panel to ignore the OSJ Agreement. <u>See</u>, Isenberg's Response to Synergy's Motion to Transfer Venue, May 12, 2008, p. 2 ("*First of all, [Synergy] fails to address the fact that it has come forward with two contracts…*"). In fact, the Rep Agreement has nothing to do with the issue that was before the Panel and is now before the Court. As discussed above, Isenberg even admitted that his entire case was limited to alleged defamatory disclosures Synergy placed on his Form U-5. As such, any future arbitration will center on the truth of any such statements, and whether Synergy was privileged to make the Termination Disclosures it made on Form U-5. As the Termination Disclosures show (Exhibit A), Synergy terminated Isenberg for breaching his supervisory obligations – duties that arose solely from the OSJ Agreement. It follows clearly

---

[1] Since the Director did not order the matter to be transferred, the Panel assumed it could ignore the clear language of the OSJ Agreement and denied Synergy's motion. While the Arbitration Panel that was appointed appears to have experience in the securities industry, none of its members appear to understand the requirements of the Federal Arbitration Act.

that where Isenberg's termination and his allegations about defamation relate solely to his duties as Branch Manager of an OSJ, the OSJ Agreement applies to such behavior and necessitates that arbitration take place in Charlotte, North Carolina.

**II.  THE TORT CANNOT BE SEPARATED FROM THE CONTRACT.**

Before the Panel, Isenberg argued that neither contract applied to his remaining claim. He stated as follows:

> *...the Statement of Claim in this case primarily involves a claim arising out of [Synergy's] defamatory statements made **subsequent** to [Isenberg's] resignation and complete separation from the firm. Therefore, neither contract's arbitration provision would apply here.*
> *[Isenberg's emphasis]*

<u>See</u>, Isenberg's Response to Synergy's Motion to Transfer Venue, May 12, 2008, p. 3. Without stating so directly, Isenberg appears to argue that the OSJ Agreement was not relevant because Synergy filed the Form U-5 after Isenberg's termination. However, he cannot for convenience's sake separate the alleged tort from the contract. It was the OSJ Agreement – and the OSJ Agreement alone – that elevated Isenberg from a mere registered representative who had no duty to supervise, to Branch Manager who had the duty to supervise and to prevent from occurring those events described in the Termination Disclosures. In no less than 19 sub-sections spanning four pages, the OSJ Agreement outlined Isenberg's supervisory responsibilities as Branch Manager. <u>See</u>, Exhibit B, OSJ Agreement, Section 3, "*Duties, Obligations Responsibilities of Contractor,*" pp. 2-5, sections (a) through (s). The question of whether or not the Termination Disclosures Synergy made were true, and thus not defamatory, will necessarily require that an arbitration panel closely scrutinize Isenberg's supervisor activities - because the Termination Disclosures pertained to Isenberg's failure to supervise.

### III. THE ARBITRATION PANEL WAS BOUND TO GIVE EFFECT TO THE PARTIES' CLEAR INTENT TO ARBITRATE IN CHARLOTTE.

The Florida Arbitration panel cannot ignore the express terms of a written agreement. The Federal Arbitration Act demands that parties' written agreements to arbitrate be enforced as written. In a case reaffirmed as recently as February 2008, the U.S. Supreme Court held:

> *Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract* and resort to the courts. Such a course could lead to prolonged litigation, one of the very risks the parties, by contracting for arbitration, sought to eliminate. In The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972), we noted that *the contract* fixing a particular forum for resolution of all disputes
>
> *"was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."* [Emphasis Added].

*Southland Corp.* v. *Keating*, 465 U.S. 1, 7 (1984); See, also, *Preston v. Ferrer*, 128 S. Ct. 978, 983, n. 2 (February 20, 2008)(reaffirming *Southland*).

### IV. EVEN LOOKING BEYOND THE CONTRACT'S CLEAR LANGUAGE, ALL OTHER FACTORS MILITATE IN FAVOR OF CHARLOTTE.

Finally, beyond the clear language of the OSJ Agreement, there are additional factors that militate in favor of Charlotte, North Carolina being the proper venue for the arbitration. They include the following facts:

(a) As a broker-dealer, Synergy is required by Rules 17a-3 and 17a-4 of the Securities Exchange Act of 1934 to maintain all relevant books and records at its Charlotte, North Carolina headquarters.

(b) Witnesses to Isenberg's failure to supervise are currently employed in Synergy's Charlotte office.

(c) Both contracts specify that North Carolina law will apply.

(d) At the time they entered into the two agreements, the parties could have selected Florida as the venue of choice, but they did so on neither occasion.

(e) The only agreement executed upon Isenberg's assumption of supervisory responsibility was the OSJ Agreement, which specifies Charlotte as the chosen venue.

Failure to acknowledge venue provisions in arbitration agreements not only ignores the requirements of the Federal Arbitration Act, but permits registered representatives and others employed by broker-dealers to venue-shop if they happen to change their residence. The only conclusion that can be drawn from the Florida Arbitration panel's decision is that Isenberg's reason for filing his claim in Florida was solely one of convenience to him.

## CONCLUSION

For the foregoing reasons, Synergy Investment Group, LLC moves the Court to stay the arbitration styled, *P. David Isenberg v. Synergy Investment Group, LLC*, FINRA-DR Arb. No. 08-00688, which is currently pending before the Financial Industry Regulatory Authority, Dispute Resolution, in Orlando, Florida, and/or to compel arbitration in Charlotte, North Carolina.

This the 15 day of September, 2008.

TROUTMAN SANDERS LLP

By: /s/ Gavin B. Parsons
    Gavin B. Parsons
N.C. State Bar No. 28013
Attorney for Synergy Investment Group, LLC
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: (919) 835-4107
Facsimile: (919) 829-8715

gavin.parsons@troutmansanders.com

Of Counsel:
Dexter B. Johnson
Mallon & Johnson, P.C.
33 N. Dearborn St., Ste. 300
Chicago, IL 60602
Telephone: (312) 346-8890
Facsimile: (312) 346-8896

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and that I served this document upon the attorney of record in the underlying arbitration by depositing a copy thereof in the United States Mail, postage prepaid, and addressed as follows

Neal J. Blaher, Esq.
Allen, Dyer, Doppelt,
Milbrath & Gilchrist, P.A.
P.O. Box 3791
Orlando, Florida 32802-3791

By: /s/ Gavin B. Parsons
    Gavin B. Parsons
N.C. State Bar No. 28013
TROUTMAN SANDERS LLP
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: (919) 835-4107
Facsimile: (919) 829-8715
gavin.parsons@troutmansanders.com